STATE OF NORTH CAROLINA
v.
WILLIAM PAUL RONZIO, JR.
No. COA08-245
Court of Appeals of North Carolina
Filed December 2, 2008
This case not for publication
Attorney General Roy Cooper, by Associate Attorney General Jess D. McKeel, for the State.
Robert J. McAfee, for defendant-appellant.
ELMORE, Judge.
On 11 January 2004, defendant William P. Ronzio was cited for driving while impaired ("DWI") and driving while license revoked. On 8 December 2004, defendant was convicted in Wake County District Court. [See Motion to Amend] Defendant appealed and a trial de novo was held in Wake County Superior Court. The case was tried at the 28 February 2007 Criminal Session of Wake County Superior Court.
The evidence presented at trial tended to show the following: On the morning of 11 January 2004, Joseph Stevens was driving along Highway 401 South between Raleigh and Garner, North Carolina. Stevens observed a black, Chevrolet S-10 pickup truck with lightly tinted windows "come up kind of flying." Both vehicles stopped at a light, and Stevens observed shadows inside the pickup truck on the driver's side. After the light changed, the truck pulled away and Stevens lost sight of it. Stevens later saw the pickup truck again on Highway 401 as he was approaching Fuquay-Varina. While stopped at a traffic light, Stevens watched the pickup truck turn onto Airport Road. Stevens also turned onto Airport Road and came upon the same truck at the bottom of a hill and on the side of a ditch, "turned over" and "against [a] tree." Stevens observed a person walking along the side of the road, approximately ten feet away from the truck. Stevens stopped his vehicle and asked the person if he needed any help, but the person declined Stevens' offer of assistance. Stevens then drove home and called 911. Stevens identified defendant as the person he spoke to on the side of the road, and testified that defendant "must have been" the driver of the truck.
Captain Tom Veasey, who was acting captain of the Fuquay-Varina Fire Department, was among those who responded to Stevens' 911 call. Captain Veasey observed "an overturned Chevy S-10 off the side of the road[,]" with defendant "pacing around the vehicle[.]" Defendant informed Captain Veasey "that he had been out drinking" and that a man named "Adam," whom he had met for the first time that evening, was driving the truck. Defendant described "Adam" as "a white guy about his height, wearing blue jeans, blue shirt, no jacket." Defendant told Captain Veasey that "Adam had left him hanging upside down in the vehicle, just ranoff." Captain Veasey stated that he "definitely smelled a strong odor of alcohol" coming from defendant's breath. Captain Veasey also stated that he saw no other person in the area of the vehicle. According to Captain Veasey, defendant asked if he could leave and "come back later, that he had to get out of North Carolina." Trooper C.V. Barrett of the North Carolina Highway Patrol also responded to the scene of the accident. Trooper Barrett was directed to a Garner EMS vehicle where he found defendant standing in the back of the vehicle. Trooper Barrett testified that defendant was "fighting . . . off" EMS workers who were attending to a cut on defendant's cheek. Trooper Barrett introduced himself to defendant, and defendant asked him if he "had found the driver or guy that was with him." Defendant told Trooper Barrett that a "friend of his, a Paul 'McSomething,' was driving, he only knew him for a week." Defendant was unable to provide a description of "Paul McSomething[.]" Trooper Barrett later learned from fire department officials that defendant had provided the name "Adam," along with a description, as the driver of the vehicle. Defendant made no mention to Trooper Barrett of any individual named "Adam." Trooper Barrett asked for defendant's driver's license, but defendant stated he did not have one because he had lost it the previous day due to a charge for driving while intoxicated. During the course of the conversation, Trooper Barrett observed that defendant's "eyes were red, glassy," that "[h]e had a strong odor of alcohol on his breath," and that he "seemed unsteady on his feet." After talking with defendant, Trooper Barrett investigated defendant's vehicle and the surrounding area. Trooper Barrett noted only one set of footprints in the dirt as he approached the vehicle, and observed blood smears inside the vehicle on the passenger side. Trooper Barrett, who was tendered and accepted as an expert witness in accident reconstruction, testified that there likely had been only one person in the vehicle. Trooper Barrett then went to the hospital to interview defendant a second time. At the hospital, Trooper Barrett "still detected the same odor of alcohol coming from about [defendant's] breath" and noted that defendant's "eyes were still red and glassy." Trooper Barrett asked defendant again what happened regarding his accident. This time, defendant told Trooper Barrett a different version of events. Trooper Barrett testified that defendant "advised me that . . . he was going home. He said 6 deer ran in front of him, he tapped his brakes and the brakes locked up, and he lost control, almost struck a house."
Trooper Barrett determined that defendant had "consumed a sufficient quantity of impairing substance to appreciably impair his physical and mental faculties" and advised defendant that he was going to place him under arrest. Trooper Barrett gave defendant a copy of his rights pertaining to drawing blood, and defendant threw it on the floor. Defendant then told Trooper Barrett that "he was wrong, he shouldn't have been driving because he had been drinking, and because he had been drinking it caused his license to be revoked." Nevertheless, blood was drawn from defendant at 12:58 p.m. The blood registered an alcohol concentration of .14 grams of alcohol per 100 milliliters of whole blood. [R. pp. 79-83, 96] Later, after Trooper Barrett transported defendant to the jail and read defendant his Miranda rights, defendant recanted on his statement made in the hospital and denied having driven the pickup truck.
Just prior to trial, defendant made an oral motion in limine seeking to prevent admission into evidence any mention of his prior DWI charge. Defendant cited N.C. Gen. Stat. § 8C-1, Rule 403 and argued that the "probative value [of the evidence] is going to be substantially outweighed by the prejudicial effect that it's going to have." The trial court reserved making a ruling on the motion. During the trial, the State introduced evidence that at the time of the accident, defendant's license had been revoked as a result of the prior charge for DWI. Defendant renewed his objection. The trial court overruled the objection, thus denying defendant's motion in limine.
At trial, defendant offered the testimony of David Harding, one of his co-workers, in his defense. Harding claimed that he was with defendant on the evening of 10 January 2004. Harding testified that they started the night at a bowling alley, and then went to the home of a friend, Paul Trango. Harding observed defendant drinking at Trango's home. Harding also testified that defendant left Trango's house around 6:00 a.m. with a man named "Roddie," whom they had met that evening at the bowling alley. Harding stated that defendant entered the passenger side of the pickup truck, and Harding gave the keys to defendant's truck to Roddie.
Defendant was convicted of driving while license revoked and driving while impaired. The jury found two aggravating factors relating to defendant's conviction for impaired driving. The jury found that defendant, at the time of the offense, was driving with a revoked license because of impaired driving, and defendant's negligent driving led to a reportable accident. Additionally, the trial court found as a grossly aggravating factor that defendant had been "convicted of an offense involving impaired driving which conviction occurred after the date of the offense for which the defendant is being sentenced but before or contemporaneously with the sentencing in this case." Accordingly, the trial court imposed a Level I punishment and sentenced defendant to a term of eighteen months imprisonment. Defendant appeals.
We first consider defendant's argument that the trial court erred by denying his motion in limine and overruling his objection to admission of evidence that his driver's license had been revoked due to a previous DWI charge. Defendant notes that he offered to stipulate that his license was revoked at the time of his arrest, and contends that admission of evidence relating to the previous DWI was irrelevant and prejudicial.
Assuming arguendo that admission of the evidence was error, we conclude it was harmless error in light of the overwhelming evidence of defendant's guilt. "The erroneous admission of evidence requires a new trial only when the error is prejudicial." State v. Chavis, 141 N.C. App. 553, 566, 540 S.E.2d 404, 414 (2000)(citing State v. Locklear, 349 N.C. 118, 149, 505 S.E.2d 277, 295 (1998), cert. denied, 526 U.S. 1075, 143 L. Ed. 2d 559 (1999)). "To show prejudicial error, a defendant has the burden of showing that 'there was a reasonable possibility that a different result would have been reached at trial if such error had not occurred.'" Id. (citing Locklear, 349 N.C. at 149, 505 S.E.2d at 295; N.C. Gen. Stat. § 15A-1443(a)(1999)).
Here, Stevens identified defendant being the only person found in the vicinity of the truck after it crashed. Trooper Barrett, an expert in accident reconstruction, testified that in his opinion, there was only one person in the vehicle when it crashed. At the scene of the accident, defendant first claimed that a person he had just met that night named "Adam" was driving, but a short time later told Trooper Barrett that "Paul McSomething" was the driver. Finally, at the hospital, defendant admitted to Trooper Barrett that he was driving the truck and that "he shouldn't have been driving because he had been drinking." In light of this evidence, defendant has failed to demonstrate prejudice. See State v. Grant, 178 N.C. App. 565, 576, 632 S.E.2d 258, 266 (2006)("'Erroneous admission of evidence may be harmless where there is an abundance of other competent evidence to support the state's primary contentions, or where there is overwhelming evidence of [the] defendant's guilt.'") (quoting State v. Weldon, 314 N.C. 401, 411, 333 S.E.2d 701, 707 (1985)), disc. review denied and appeal dismissed, 361 N.C. 223, 642 S.E.2d 712 (2007). Accordingly, we overrule defendant's assignment of error.
Defendant next argues that the trial court erred by finding as a grossly aggravating factor that he had been "convicted of an offense involving impaired driving which conviction occurred after the date of the offense for which the defendant is being sentenced but before or contemporaneously with the sentencing in this case." Defendant contends that the finding violates Blakely v. Washington, 542 U.S. 296, 159 L. Ed. 2d 403, reh'g denied, 542 U.S. 961, 159 L. Ed. 2d 851 (2004).
After careful review of the record, briefs and contentions of the parties, we find no error. In State v. Blackwell, 361 N.C. 41, 638 S.E.2d 452 (2006),cert. denied, Blackwell v. North Carolina, ___ U.S. ___, 167 L. Ed. 2d 1114 (2007), our Supreme Court held that Blakely error is subject to harmless error review. Blackwell, 361 N.C. at 44, 638 S.E.2d at 455. Defendant claims that the trial court's finding of the grossly aggravating factor violates Blakely because aggravating factors increasing a defendant's sentence must be submitted to a jury and proved beyond a reasonable doubt. However, "Blakely itself specifically excluded several categories of aggravated sentences from the scope of the right it contemporaneously recognized[,]" including, inter alia, "those imposed on the basis of 'a prior conviction[.]'" State v. Everette, 361 N.C. 646, 653, 652 S.E.2d 241, 246 (2007) (quoting Blakely, 542 U.S. at 301, 159 L. Ed. 2d at 412). Therefore, we conclude the trial court did not err by finding the grossly aggravating factor. Accordingly, we find no error. No error.
Judges WYNN and GEER concur.
Report per Rule 30(e).